IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

BRANDON DOM,

     Defendant.

CRIMINAL ACTION NO.
1:19-cr-00325-2-AT-LTW

## FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is presently before the Court on Defendant Brandon Dom's ("Defendant") Motions to Suppress. [Docs. 49, 50]. On July 19, 2021, the undersigned held an evidentiary hearing on the motions. [Doc. 108]. Defendant perfected his motions only with respect to the issue of whether the "duration of the traffic stop was illegally extended beyond what was appropriate for the reason for the stop." [Doc. 110].[1] The Government filed its response in opposition to Defendant's motions. [Doc. 111]. Defendant did not file a reply within the timeframe ordered by the Court and did not seek an extension of time for his reply. See [Doc. 109]. As such, the

---

[1] Because Defendant did not perfect his motions with respect to the other issues raised in his initial briefs, those issues are deemed abandoned. See [Docs. 49, 50]. Thus, only the issue of the allegedly prolonged traffic stop is discussed below.

motions are ripe for review. For the reasons outlined below, the Court **RECOMMENDS** that Defendant's Motions to Suppress be **DENIED**.

## FACTUAL BACKGROUND

As part of a drug trafficking investigation, Drug Enforcement Administration ("DEA") personnel arranged a controlled purchase of methamphetamine from a courier later identified as co-Defendant Alexis Sanchez. [Doc. 108 at 10:10–14]. During the meeting, the undercover officer asked to purchase more methamphetamine than initially planned, prompting Sanchez to go to a nearby residence to obtain the additional methamphetamine and then return to the deal location. [Id. at 10:15–11:16]. DEA personnel surveilled Sanchez during this encounter and continued to surveil him afterwards. [Id. at 10:21–11:25].

Later that same day, agents saw Sanchez leave the same residence travelling in the same vehicle he used for the transaction with the undercover officer. [Id. at 11:20–12:21]. Sanchez drove to a parking lot where he met with the occupants of a red Hyundai, later identified as co-Defendant Uriel Aguirre-Cuellar—who was driving—and the Defendant—who was a passenger. [Id. at 11:20–12:18; 51:4–20]. Sanchez got out of his car carrying a Home Depot box, which he placed into the trunk of the Hyundai. [Id. at 12:2–4]. Sanchez then got into the backseat of the Hyundai, where

2

he remained briefly before exiting carrying a brown bag.  [Id at 12:4–7].   DEA personnel surveilled this encounter and, based upon a variety of factors, believed that a drug transaction had taken place.  [Id. at 13:17–22, 31:17–32:7].

Prior to the transaction, DEA personnel had requested the assistance of Georgia State Patrol ("GSP") Troopers Jonathon Nelms and David Whitehead.  [Id. at 82:7–83:5, 107:16–108:14].  DEA agents were in contact with the GSP Troopers during the transaction between Sanchez, Aguirre, and the Defendant and told the Troopers they believed a drug transaction had occurred.  [Id. at 13:10–14:11].  The DEA agents then asked the Troopers to be on the lookout for the red Hyundai and to monitor it for a traffic violation that would independently justify a traffic stop of the vehicle.  [Id.].  Trooper Whitehead ran the vehicle's license plate through a computer-based database, which indicated the vehicle's registration was expired.  [Id. at 115:7–13].  Trooper Whitehead relayed that information to Trooper Nelms who stopped the vehicle. [Id. at 115:14–16]; see also [id. at 50:8–18].  At the time of the stop, Trooper Nelms was aware that the vehicle was suspected to have methamphetamine in the trunk.  [Id. at 44:6–17].

After stopping the vehicle, Trooper Nelms approached the driver—Aguirre—who did not have a driver's license and instead provided an identification card from

Mexico. [Id. at 50:10–22]. Defendant provided a South Carolina driver's license. [Id. at 50:22–24]. Trooper Nelms then asked Aguirre who the vehicle belonged to and Aguirre responded that it was a friend's car, but Trooper Nelms knew the car was a rental. [Id. at 50:24–51:3]. Trooper Nelms then instructed Aguirre to come to the rear of the car where Trooper Nelms reviewed the documents and continued speaking with Aguirre. See [id. at 54:22–55:2]. According to Trooper Nelms, Aguirre appeared unusually nervous and said he was looking for a storage facility even though he had turned into a completely residential area with no storage locations. See [id. at 56:9–57:14]. At this point, less than three minutes into the stop, Trooper Nelms suspected Aguirre was involved in criminal activity beyond simply driving a car with an expired registration. [Id. at 56:25–57:4]; see also [id. at 50:5–18, 55:19–57:22]. Trooper Nelms' suspicion was based on the information from the DEA about the suspected drug transaction, Aguirre's inconsistent reason for being in the residential neighborhood where he was stopped, Aguirre's inconsistent answer about the owner of the vehicle, and Aguirre's nervousness. [Id. at 57:5–14].

Trooper Nelms then returned to his patrol car to run records check on Aguirre and Defendant. [Id. at 57:24–58:10]. Trooper Nelms then spoke with Defendant, who provided an inconsistent answer about where he and Aguirre were going and about who

4

the car belonged to.  [Id. at 61:17–62:13].  Five and a half minutes into the traffic stop, Trooper Nelms asked Aguirre for consent to search the car and Aguirre provided verbal consent.  [Id. at 63:1–12].  Trooper Nelms began to search the car approximately eight minutes after the traffic stop began.  See [id. at 65:21–24]. During the search, Trooper Nelms found marijuana, a vacuum-sealed bag containing a large amount of money, and the Home Depot box in the trunk with approximately ten kilograms of methamphetamine.  [Id. at 66:16–70:14].  About sixteen minutes after the traffic stop began, Defendant was arrested and read a Miranda[2] warning.  [Id. at 71:2–7].

## LEGAL STANDARD

The Fourth Amendment protects people from unreasonable search and seizures. See U.S. CONST. amend. IV.  A traffic stop constitutes a seizure within the meaning of the Fourth Amendment.  Delaware v. Prouse, 440 U.S. 648, 653 (1979).  However, a routine traffic stop is a limited form of a seizure, more akin to an investigative detention than a custodial arrest.  United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing Berkemer v. McCarty, 468 U.S. 420, 437 (1984)).  In evaluating the constitutionality of an investigatory stop, the court must examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

5

the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20 (1968).  The duration of the investigative detention must "last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983).  However, officers are still allowed to ask ordinary inquiries incident to every traffic stop, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 575 U.S. 348, 355 (2015).

## ANALYSIS

As an initial matter, Defendant's entire argument is based on the incorrect assertion that the only "purpose of the stop [was] the expired registration." See [Doc. 110 at 7]. As the Government persuasively argues, Trooper Nelms had a reasonable articulable suspicion of drug trafficking at the time he made the traffic stop, justifying any questioning beyond those intrinsic to an ordinary traffic stop.  [Doc.111 at 12–16].  Defendant is "incredulous[ ]" about the DEA agents opining "that a drug deal had occurred" based on the fact that Sanchez—a known drug trafficker—placed a box in the trunk of the red Hyundai before briefly sitting in the back seat and exiting with a brown plastic bag.  [Doc. 110 at 3–4].  But based on the agents' training and experience, that was more than enough information to form a reasonable, articulable

6

suspicion that a drug deal had occurred.  See, e.g., United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000) (holding that officers had a "reasonable suspicion that something related to drug trafficking had occurred" where the defendant met with a known drug trafficker "quickly in [a] garage and [then] left quickly" no longer carrying a backpack).  The fact that the officer conducting the stop, Trooper Nelms, did not personally observe the transaction with Sanchez is irrelevant because the information was relayed to him before the stop.  See [Doc. 108 at 44:6–17]; see also United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998) (holding that the officer who makes the stop need not be the one who observed the suspicious activities if that information has been relayed to him).

Even if Trooper Nelms lacked a reasonable articulable suspicion of drug activity at the time he stopped the red Hyundai, he developed an independent reasonable suspicion of criminal activity—beyond simply driving a car with an expired registration—within the first three minutes of the traffic stop.  See [Doc. 108 at 56:25–57:4]; see also [id. at 50:5–18, 55:19–57:22].  To the extent the traffic stop was "prolonged" after Trooper Nelms formed "a reasonable suspicion of other illegal activity beyond the traffic offense," his further investigation into that other illegal activity does not run afoul of the Fourth Amendment.  See United States v. Perkins,

348 F.3d 965, 970 (11th Cir. 2003).  Thus, Defendant needs to show Trooper Nelms'
questions during those first three minutes were "illegal[,]" as he claims.  [Doc. 110 at
4–5].  Defendant's argument is that the Troopers ran the license plate before the traffic
stop occurred and thus had no need to ask any questions to "complet[e] the traffic stop
for the expired registration offense."  See [Id.]; see also [id. at 6–7] (arguing that none
of the questions Trooper Nelms asked were "reasonably related to the actual reason for
the traffic stop (the expired registration)").

    As noted above, during any traffic stop officers can ask certain ordinary
inquiries, such as "checking the driver's license, determining whether there are
outstanding warrants against the driver, and inspecting the automobile's registration
and proof of insurance."  Rodriguez, 575 U.S. at 355.  Thus, the issue is not whether
the questions Trooper Nelms asked were strictly related to the expired registration, as
Defendant tries to argue.  See [Doc. 110 at 4–7].  Instead, the issue is whether the
questions were within the "scope of the traffic stop," which encompass other ordinary
inquires.  See United States v. Braddy, 11 F.4th 1298, 1310–12 (11th Cir. 2021).
During the relevant timeframe, Trooper Nelms asked for identification ([Doc. 108 at
50:19–24]), asked Aguirre who the vehicle belonged to ([id. at 50:24–25]), and asked

Aguirre where they were going ([id. at 56:9–11]).  All those questions are within the ordinary scope of a traffic stop and none of them unlawfully delayed the stop.

Trooper Nelms could not have written a citation for the driver without knowing who the driver was.  Trooper Nelms needed to get identification so he could write that information on the citation.  Moreover, it is well established that "licenses and registration papers are subject to inspection" any time a vehicle is stopped for a traffic violation.  Prouse, 440 U.S. at 659.  Likewise, Trooper Nelms' "questions about the ownership of the vehicle [Aguirre] was driving were also well within the scope of the traffic stop."  Braddy, 11 F.4th at 1311.  And Trooper Nelms' "questions related to [Aguirre's] traffic plans or itinerary are ordinary inquires related to a traffic stop."  Id. In combination with the information Trooper Nelms had from the DEA about the suspected drug transaction, Aguirre's inconsistent reason for being in the residential neighborhood where he was stopped, his inconsistent answer about the ownership of the vehicle, and Aguirre's nervousness all formed a reasonable articulable suspicion of further criminal activity.  See [Doc. 108 at 57:5–14].

Although Trooper Nelms had formed that suspicion, the ordinary inquiries incident to any traffic stop had not been completed.  For example, Trooper Nelms had not yet run Aguirre's information to see "if he had any warrants for him."  [Doc. 108

9

at 56:25–58:6].  Defendant's suggestion that there was no "need for [such] computer checks to be conducted" misses the mark.  See [Doc. 110 at 6].  Checking for "outstanding warrants" is among the ordinary inquiries that officers can engage in incident to any traffic stop.  See Rodriguez, 575 U.S. at 355.

The undersigned concludes that, based on the information provided to him by DEA personnel, Trooper Nelms had a reasonable articulable suspicion of drug trafficking at the time he stopped the red Hyundai.  Thus, the permissible scope of his questioning was far broader than Defendant contends, and Trooper Nelms did not impermissibly prolong the duration of the stop.  Even if the only reason for the traffic stop were the expired registration, as Defendant contends, Trooper Nelms' actions still did not impermissibly prolong the duration of the stop.  Trooper Nelms simply asked ordinary questions incident to any traffic stop over the course of a scant few minutes.  See [Doc. 108 at 50:10–25, 56:9–11].  In combination with the information Trooper Nelms had from the DEA, Aguirre's nervousness and inconsistent answers to Trooper Nelms' questions gave rise to an independent reasonable articulable suspicion of criminal activity.  See [id. at 57:5–14].  At the time Trooper Nelms formed this reasonable suspicion, he had not completed the kind of "ordinary inquires" incident to any traffic stop because he had not yet checked on whether the occupants of the red

Hyundai had any outstanding warrants.  [Doc. 108 at 56:25–58:6]; see also Rodriguez, 575 U.S. at 355.  The traffic stop and subsequent questioning was well within the bounds of the Fourth Amendment, and as such Defendant's Motions to Suppress are due to be denied.

### CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motions to Suppress ([Docs. 49, 50]) be **DENIED**.  There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.  **IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED, REPORTED, AND RECOMMENDED**, this ___17___ day of December, 2021.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

11